# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## Case No. 21-3143

Jiangsu Beier Decoration Materials Co., Ltd.,

*Appellant*

**v.**

Angle World LLC,

*Appellee.*

## REPLY BRIEF OF APPELLANT

APPEAL FROM THE ORDER DATED OCTOBER 28, 2021 OF THE UNITED
STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA AT DOCKET NO. 2:21-CV-02845-AB GRANTING
APPELLEE'S MOTION TO DISMISS

Richard A. Kaye (GA No. 409313)
**BARNES & THORNBURG LLP**
3475 Piedmont Road, N.E., Suite 1700
Atlanta, Georgia 30305
Telephone: (404) 264-4086
Facsimile: (404) 264-4033
E-mail: Rich.Kaye@btlaw.com

William J. Burton (PA No. 322269)
**BARNES & THORNBURG LLP**
1000 N. West Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 300-3447
Facsimile: (302) 300-3456
E-mail: William.Burton@btlaw.com

# TABLE OF CONTENTS

**Page**

RESPONSE TO ANGLE WORLD'S COUNTER-STATEMENT OF THE CASE ....................................................................................................1

ISSUES ON APPEAL ...........................................................................11

ARGUMENT ........................................................................................11

I.     THE PARTIES' COMMUNICATIONS SHOULD BE CONSIDERED AN "EXCHANGE OF LETTERS" UNDER THE CONVENTION............11

II.    THE BEIJING FOURTH INTERMEDIATE PEOPLE'S COURT RULING SHOULD BE GRANTED FULL FAITH AND CREDIT UNDER THE PRINCIPLE OF INTERNATIONAL COMITY ...................14

CONCLUSION …….……………………………………………………15

# TABLE OF AUTHORITIES

Page(s)

Cases

*China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*,
   334 F.3d 274 (3d Cir. 2003).................................................................. 11, 12, 13

*DiMercurio v. Sphere Drake Ins*., PLC,
   202 F.3d 71 (1st Cir. 2000)...............................................................11

*Kahn Lucas Lancaster, Inc. v. Lark International Ltd.*,
   186 F.3d 210 (2d Cir. 1999).............................................................13

*Standard Bent Glass Corp. v. Glassrobots Oy*
   333 F.3d 440 (3d Cir 2003)...............................................................13

Statutes

9 U.S.C. §§ 201-208................................................................................ 11, 12

## RESPONSE TO ANGLE WORLD'S COUNTER-STATEMENT OF THE CASE

Certain material facts set forth in the Brief of Defendant/Appellee, Angle World, LLC ("Angle World")[1] are inaccurate, unsupported and contradicted by the record. As they are material to this Court's determination, we address them herein.

The parties initiated settlement of a payment dispute in China by signing an initial Memorandum of Understanding dated June 28, 2018 ("6/28 MoU") which outlined the basic business terms of the settlement. SAppx236. This 6/28 MoU required Angle World to make an initial payment of $50,000 within two days of signing. Section V of the 6/28 MoU provides in pertinent part as follows: "USD 50,000 shall be paid the day after the signing date of this agreement." SAppx236. (the "Due on Execution Provision"). It is undisputed that Angle World never paid the $50,000 Due on Execution Provision required by the 6/28 MoU to Appellant Jiangsu Beier Decoration Materials Co. Ltd. ("JBDM"). SAppx145-146. If "[i]n fact," as Angle World claims on page 9 of its Appellee Brief, that, "as of August 2018, Appellant continued to ask Angle World ""[w]hen can we get your signed [7/10 MoU] agreement?"" further underscoring the lack of agreement beyond the 6/28 MoU" (D.I. 25 at 9), then why wasn't the payment of $50,000 ever paid by Angle World to JBDM according to the Due on Execution Provision of the 6/28

---

[1] Citations to Appellee's Opening Brief are referenced as D.I. 25 at __.

MoU? The simple answer is, the $50,000 was never paid by Angle World to JBDM because the parties modified the initial terms of settlement by replacing the 6/28 MoU with the 7/10 MoU which eliminated the Due on Execution Provision and added an arbitration provision. The Award, the Gong Declaration and the holding of the Beijing Fourth Intermediate People's Court all confirm that the parties exchanged several iterations of the 7/10 MoU (which included the arbitration provision) via email (*i.e.*, an exchange of letters).

Versions of the 7/10 MoU's originally contained the $50,000 Due on Execution Provision. It was not until the final version of the 7/10 MoU that Appellee Angle World removed the Due on Execution Provision from the 7/10 MoU and delivered the modified version to JBDM. SAppx173-175. To be clear, the various iterations of the 7/10 MoU containing the CIETAC arbitration provision and payment schedules were "exchanged" via email, hand-delivery and courier by both parties. They make up the exchange of letters that are referenced nowhere in the District Court's opinion.

Again, it was not until the parties met at the offices of Angle World on July 20, 2018, at the insistence of Angle World's President, Biao Wang, that the parties agreed to eliminate the $50,000 Due on Execution Provision. SAppx174. During this meeting, Angle World employee "Shirley" word processed the document to revise the 7/10 MoU and handed ["exchanged"] it to representatives of JBDM.

SAppx240. The version of the 7/10 MoU generated by Angle World, contained the CIETAC arbitration provision and only removed the Due on Execution Provision. SAppx155. Attached to and made a part of this exchanged version of the 7/10 MoU is a payment schedule requiring the first installment payment of $87,000 from Angle World to be made on July 28, 2018. SAppx175, 204. After signing and sealing this version of the 7/10 MoU, JBDM couriered ["exchanged"] the document to Angle World. SAppx174.

The Due on Execution Provision was stricken by Angle World from the 7/10 MoU. This is the only logical reason for Angle World never making a $50,000 payment to JBDM as was required by the superseded 6/28 MoU. At no time did Angle World remove or request that the arbitration provision be stricken from the parties' agreement.

Angle World also erroneously states "[h]ere it is beyond dispute that there were no written back-and-forth exchanges between the parties evidencing Appellee's acceptance of the 7/10 MoU, namely the arbitration clause. Equally beyond dispute is that the Appellant unilaterally revised or modified the 6/28 MoU and sent Appellees the 7/10 MoU in which Appellant added a new material term, an arbitration clause." (D.I. 25 at 17.) As set forth above, the parties exchanged by electronic email various iterations of the 7/10 MoU (all containing the CIETAC arbitration provision) and exchanged the final version by hand-delivery, with Angle

3

World's modification. JBDM also exchanged a signed version of that document via courier to Angle World. SAppx172-177.

As evidence that the parties reached an agreement on the terms of the 7/10 MoU, on July 26, 2018, JBDM emailed Angle World's President Biao reminding him that the first payment under the 7/10 MoU was due on July 28, 2018. Mr. Biao ratifying the 7/10 MoU and payment schedule, confirmed back to JBDM and Angle World's Chief Financial Officer via email, that the payment was in fact due on the 28th of July. SAppx175, 205-208. On August 29, 2018, in response to an email from the COO of Angle World, Jason Pyon, seeking an extension to make the second payment under the 7/10 MoU, JBDM agreed to the extension and asked Mr. Pyon when they would receive a signed version of the 7/10 MoU. Mr. Pyon never conveyed to JBDM that Angle World would not accept the final 7/10 MoU that Angle World itself modified, but rather was only concerned with seeking an accommodation on the 2nd payment due date under that very MoU.

Angle World also states "[t]he matter was referred to the Beijing fourth intermediate People's Court." (D.I. 25 at 6.) That statement is misleading at best as Appellee does not clearly state that Angle World itself filed a motion to stay and dismiss the CIETAC arbitration filed by JBDM and sought a declaratory judgment on the issue of the validity of the parties' 7/10 MoU. Angle World goes on to erroneously claim that "the Chinese court only addressed the issue of whether the

arbitration clause in the 710 MOU was valid under Chinese law." (D.I. 25 at 6.) In fact, Appellee confirms in the very next paragraph that the issue before the Beijing Fourth Intermediate People's Court was whether the parties had entered into a binding agreement, the arbitration provision being only one paragraph thereof. And as the Appellee correctly states, "the Court found that the 7/10 MoU was a valid and enforceable contract under Chinese law." (D.I. 25 at 7.) What Appellee has left out of its representation concerning the Beijing Fourth Intermediate People's Court ruling, is that the Court found that exchanges of emails was the manner by which the parties customarily contracted with each other in their normal course of dealing, and this, combined with the fact that Angle World made two payments according to the 7/10 MoU payment schedule, evidenced that the parties had entered into an enforceable agreement. The Beijing Fourth Intermediate People's Court held:

> With regard to this argument, the Court holds the view that the parties entered into or modified the contracts by email during the course of long-term business, so did the 710 MoU. In accordance with the facts confirmed by the Court, the 710 MoU was an adjustment and supplement to the 628 MoU. Angle World did not raise any objections against the newly added arbitration clause when it received 710 MoU. Therefore, Angle World can be presumed to have accepted the Arbitration Clause in 710 MoU. Also, as a matter of fact, both parties have actually performed the 710 MoU, so the 710 MoU is the contract that has actually come into effect, and thus the arbitration clause contained in it shall also be effective.

SAppx157.

In essence, the Beijing Fourth Intermediate People's Court found the parties had entered into a contract by virtue of their exchange of emails and documents followed by performance, and particularly, the making of two installment payments under the 7/10 MoU by Angle World. [2]

Angle World also erroneously states that, "[o]n March 11, 2021, the CIETAC tribunal improperly and wrongly found favor of the Appellant and issued arbitral award in the Appellant's favor." (D.I. 25 at 7.) Angle World has never sought to set aside the factual findings or relief granted in the award on the basis that it was improperly or wrongly founded.[3]

---

[2] On or about the time that Angle World was seeking an extension for the Second installment payment, Jason Pyon, COO of Angle World accused JBDM of telling Angle World's clients that it was going out of business, trying to steal Angle World's business and slandering Angle World. JBDM denied this and requested a signed settlement agreement back from Angle World. SAppx212-214. During this particular exchange, Mr. Pyon wanted the extension acknowledgement in writing from JBDM (SAppx176), confirming the acceptable deviation from the terms of the 7/10 MoU and its payment schedule. JBDM believes that these accusations of alleged interference is what led to Angle World cutting its ties with JBDM and making no further payments under the 7/10 MoU.

[3] Although one of three arbitrators delivered a dissenting opinion, the majority concurred in the Award. Under CIETAC Rules, the dissenting opinion does not become part of the final award. The Award itself, states: "Attachment: Dissenting opinion of arbitrator Jim Min (According to Article 49.5 of the Arbitration Rules, this opinion does not form part of the award)." SAppx24. Even so, Angle World attached the dissenting opinion to its Motion to Dismiss but failed to translate this exculpatory language and properly inform the Court below the dissent was not part of the Award. SAppx128.

Angle World highlights that the Beijing Fourth Intermediate People's Court neither **"addressed nor dealt with the issue of whether a US Court could enforce a foreign arbitral award under Article II, Section 2 of the Convention.** (D.I. 25 at 6) (emphasis in original). Although this may be factually true, that particular issue was not raised by Angle World in its motions for declaratory judgment and to stay the CIETAC arbitration. The Beijing Fourth Intermediate People's Court did find however that based upon the parties' course of dealing, the 7/10 MoU transmitted in various exchanges of emails, in-person interactions and couriered documents created a valid and binding agreement, the terms of which contained the CIETAC arbitration provision. The Beijing Fourth Intermediate People's Court stated:

> [T]he Court holds the view that the parties entered into or modified the contract by mail during the course of long-term business, so did the 710 MOU. In accordance with the facts confirmed by the Court, the 710 MOU was an adjustment and supplement to the 628 MOU. Angle World did not raise any objections against the newly added arbitration clause when it received the 710 MOU. Therefore, Angle World can be presumed to have accepted the Arbitration Clause in the 710 MOU. Also, as a matter of fact, both parties actually performed the 710 MOU, so the 710 MOU is the contract that has actually come into effect, and thus the arbitration clause contained in it shall also be affected.

SAppx158.

The performance by Angle World recognized by the Beijing Fourth Intermediate People's Court is the payment of two $87,0000 installments under that 7/10 MoU, ratifying the terms of the 7/10 MoU and the intentions of the parties to be bound by this 7/10 MoU.

Angle World also erroneously states: "The CIETAC tribunal essentially adopted the Chinese Court's ruling and improperly decided the question of arbitrability based upon Chinese law and the CISG, despite the absence of any agreement to submit the question of arbitrability to the CIETAC tribunal." (D.I. 25 at 7.) In fact, nothing could be further from the truth. The CIETAC tribunal waded through the long and detailed interactions and exchange of documents between the parties, making its own factual findings to support CIETAC's jurisdiction. SAppx14-22. Prior to setting forth the facts upon which the Award (attached to Appellant's Petition to Confirm Arbitration Award, SAppx10-24) was based, the CIETAC tribunal stated: "[h]owever, in order to better explain the reasons for the Arbitration Tribunal's award, the Arbitration Tribunal will spend considerable effort to explain the validity of the "July 10 Memorandum" as below. SAppx21.

What follows in the Award is a full and complete statement of facts, surrounding the 6/28 and 7/10 MoU's considered by the CIETAC Tribunal to determine jurisdiction and resolve the parties' dispute.[4]

One of the inferences made by the Beijing Fourth Intermediate People's Court is also worth noting. In its opinion, the Beijing Fourth Intermediate People's Court called out one absurd position that permeates Angle World's entire argument

---

[4] This recitation specifically includes all of the exchanges of emails, as well as in-person and couriered exchanges of the MoU's.

concerning the validity of the 6/28 MoU and the invalidity of the 7/10 MoU: That is, according to Mr. Biao himself, he did not have the authority to bind the company to the MoU's, including the 6/28 MoU he signed. "Wang Biao did not have the power to sign the "June 28 Memorandum" which needed to be signed by Jason, the legal representative of the respondent." SAppx21. The Tribunal's finding is certainly consistent with Mr. Biao's claim in his July 19, 2018 email to JBDM that he could not sign the 7/10 MoU needed to confirm the terms of the MoU with Jason and could not sign the 7/10 MoU without Jason's approval. In light of Angle World's position, is the 6/28 MoU valid if not signed or blessed by Jason Pyon? The answer is clearly no.

Angle World, also erroneously states "[o]n August 31, 2021, Appellant filed its opposition to Angle World's Motion to Dismiss, in which it conceded there is no signed agreement in writing to arbitrate the disputes relating to the MoU, and *for the first time* claimed there was a written agreement to resolve said disputes by way of an exchange of letters or telegrams and that Angle World's conduct constituted an agreement dispute by way of an exchange of letters or telegrams. Appellant made this new claim despite not pleading the same in its Petition." (D.I. 25 at 14.) Attached to Appellant's Petition to Confirm Arbitration Award is the fifteen (15) page translation of the CIETAC Arbitration Award. This Award sets forth the facts upon which the CIETAC tribunal based its enforcement of the arbitration provision,

specifically referencing the exchange of emails and documents between the parties, as well as setting forth all of the jurisdictional arguments of the Appellee and why they were rejected by both the Tribunal and the Beijing Fourth Intermediate People's Court. SAppx8-24. In Paragraphs 16 and 18 of its Petition, Appellant brought the District Court's attention to the portions of the Award regarding the jurisdictional arguments of Angle World, and a discussion of the exchange of emailed versions of the 7/10 MoU that formed the basis of the CIETAC Tribunal and Beijing Fourth Intermediate People's Court's holding, finding that the parties had a valid agreement to arbitrate. SAppx3-4. The 7/10 MoU CIETAC and Beijing Fourth Intermediate People's Court determined controlled the parties' dispute was attached to the Petition. SAppx91-92.

Lastly, Appellant has already submitted its objections to supplementing the record with the Declaration of Mr. Biao to Appellee's Brief as this document was not part of the record below. That said, if Angle World did reject the arbitration clause as the Declaration suggests, then why was that provision not stricken along with the $50,000 Due On Execution Provision it did strike from the 7/10 MoU it delivered to JBDM? As discussed below, these facts are material to the within appeal. For the reasons discussed below, the lower court's order should be reversed.

Appellant appealed the District Court's Dismissal of its Petition on two grounds:

1.    Did the District Court err as a matter of law by relying upon *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 284 (3d Cir. 2003) to determine as a matter of law that the parties initial emails, hand-delivered MOU and the parties' subsequent emails did not constitute "an exchange of letters" as provided by the Convention?

2.    Did the District Court error as a matter of law in failing to consider and grant comity to the ruling of the Beijing Fourth Intermediate People's Court on the existence of a valid agreement to arbitrate?

Appellee's attempt characterizing of the issues on appeal should be ignored.

## **ARGUMENT**

**I.    THE PARTIES' COMMUNICATIONS SHOULD BE CONSIDERED AN "EXCHANGE OF LETTERS" UNDER THE CONVENTION**

Chapter Two of the Federal Arbitration Act, 9 U.S.C. §§ 201-208, which incorporates the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), controls whether the parities to an international contract involving commerce agreed to arbitrate a dispute. *DiMercurio v. Sphere Drake Ins.*, PLC, 202 F.3d 71, 74 (1st Cir. 2000). The Convention specifically requires courts to recognize "an agreement in writing under which the

parties undertake to submit to arbitration all or any differences which have arisen . . .” Article II (1), 9 U.S.C. § 201. The Convention defines “agreement in writing” as an “arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.” *Id*. The Award attached to Appellant’s Petition to Confirm Arbitration Award sets forth in detail the exchange of correspondence (i.e., “letters”) between the parties which contained the various iterations of the parties’ settlement agreement. The 7/10 MoU was exchanged between the parties via electronic, hand-delivery and overnight courier. SAppx14-21. The 7/10 MoU’s exchanged between the parties contained an arbitration provision and at no time did Angle World protest or object to this provision. Angle World certainly seized the opportunity to object and counteroffer when it opened the 7/10 MoU in its word processing software and removed the $50,000 Due on Execution Provision from the document and delivered it to JBDM.[5] Angle World never refuted or modified the arbitration provision.

As JBDM set forth in its Opening Brief, Angle World and the District Court’s complete reliance on *China Minmetals Materials Imp. & Exp. Co., Ltd v. Chi Mei*

---

[5] As set forth above, and in Appellants Opening Brief, the 6/28 MoU contained a $50,000 due on execution provision. Angle World was supposed to pay the $50,000 within two days of signing the 6/28 MoU. It never paid it. Rather, when it received various iterations of the 7/10 Memorandum which contained both the $50,000 due on execution and arbitration provisions, Angle World only negotiated out of the parties’ final settlement, the 7/10 MoU, the $50,000 due on execution provision, never declaring its disfavor towards the arbitration provision.

*Corp.*, 334 F.3d 274 (3d Cir. 2003) is misplaced. *Minmetals* dealt with a forged document containing an arbitration provision where it cannot be said that the victim of the fraud consented to the arbitrate and agreement that it never signed or agreed to. *Id*. In the instant case, there are no allegations of fraud or that Angle World was deprived of the opportunity to review and agree to the arbitration provision in the 7/10 MoU. Angle World apparently backed out of its payment obligations under the 7/10 MoU because it suspected JBDM of improper conduct or dealings with Angle World's customers. (*See supra* note 1.)

The District Court should have relied on the holding in *Standard Bent Glass Corp. v. Glassrobots Oy,* where the Third Circuit followed the Second Circuit ruling that the "modifying phrase [of Article II] 'signed by the parties or contained in an exchange of letters or telegrams' applied to both 'an arbitral clause in a contract' and 'an arbitration agreement [.]" 333 F.3d 440 (3d Cir 2003) (citing *Kahn Lucas Lancaster, Inc. v. Lark International Ltd.*, 186 F.3d 210 (2d Cir. 1999)). As Appellee correctly states, "the Convention requires the Court to look at only whether the agreement was signed or whether there was an exchange of letters or telegrams demonstrating an agreement to arbitrate." D.I. 25 at 27. In the instant case, there was an exchange of many letters in the form of emails, in-person and couriered exchanges which meets the requirements of the Convention.

13

## II. THE BEIJING FOURTH INTERMEDIATE PEOPLE'S COURT RULING SHOULD BE GRANTED FULL FAITH AND CREDIT UNDER THE PRINCIPLE OF INTERNATIONAL COMITY

Appellant (or Appellee for that matter) has been unable to locate a single case where a party that actually initiated the action before a foreign court has asserted that the foreign court's negative finding or ruling should be ignored when the prevailing party is seeking to enforce that ruling in the United States. There are an abundance of cases that deal with negative judgments based upon default, lack of jurisdiction, unfairness, bias etc., but none where the complaining party brought the suit whose judgment it is complaining about. Angle World initiated its motion to stay arbitration and for a declaratory judgment before the Beijing Fourth Intermediate People's Court claiming, as it did in the District Court below, that the parties did not have a binding agreement to arbitrate. The Beijing Fourth Intermediate People's Court, hearing all of the facts and accepting both of the parties' pleadings, determined that the parties had a valid agreement to arbitrate and remanded the case back to CIETAC for resolution. Angle World never appealed that decision. JBDM should not be compelled to argue this issue again in the District Court, when it had previously prevailed against the Appellee/Movant in the Chinese Court. The District Court's failure to even consider this issue below constitutes reversible error.

## CONCLUSION

Nothing in Appellee's Brief explains or changes the fact that in rendering its decision, the District Court failed to consider whether certain emails and written communications between the parties constituted an "exchange of letters" pursuant to the requirements of the Convention, and that an agreement to arbitrate had been reached by the parties. After carefully and thoroughly reviewing the decisional authority on this issue, it becomes clear that the parties' "exchange of letters" in this case is more than sufficient to find an enforceable agreement to arbitrate under the Convention. Lastly, the District Court's failure to address JBDM's argument that the Beijing Fourth Intermediate People's Court's opinion, on Angle World's declaratory judgment action, should control under the principles of international comity further constitutes reversible error. As a result, JBDM respectfully requests that the District Court be reversed, that this Court hold there is an enforceable agreement to arbitrate, pursuant to the requirements of the Convention, and remand this action back to the District Court to confirm the arbitration award.

Respectfully submitted, this 4th day of May, 2022.

By: /s/ *William J. Burton*

| | |
|---|---|
| Richard A. Kaye (GA No. 409313) | William J. Burton (PA No. 322269) |
| **BARNES & THORNBURG LLP** | **BARNES & THORNBURG LLP** |
| 3475 Piedmont Road, N.E., Suite 1700 | 1000 N. West Street, Suite 1500 |
| Atlanta, Georgia 30305 | Wilmington, Delaware 19801 |
| Telephone: (404) 264-4086 | Telephone: (302) 300-3447 |
| E-mail: Rich.Kaye@btlaw.com | E-mail: William.Burton@btlaw.com |

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of the Fed. R. App. P. 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(g), the brief contains 3,741 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing certificate.

3.     In addition, pursuant to the Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the brief filed with the Court via CM/ECF is identical to the text of the copies. I further certify that the electronic version of the brief has been scanned for viruses, which is updated continuously, and is free of virus.

Dated: May 4, 2022

                                                          */s/ William J. Burton*
                                                          William J. Burton (PA No. 322269)

**CERTIFICATE OF SERVICE**

I certify that on this 4th day of May, 2022, I electronically filed the foregoing

**Reply Brief of Appellant** with the Clerk of Court for the United States Court of

Appeals for the Third Circuit using the Court's CM/ECF system. Counsel of record

for all the parties to the case are registered CM/ECF users and will be served by the

CM/ECF system.

*/s/ William J. Burton*

William J. Burton (PA No. 322269)